FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

04 SEP 30 AM 8:48

U.S.

| | | |
|---|---|---|
| **MARY TURLEY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 02-B-2113-S |
| | ) | |
| **SCI OF ALABAMA d/b/a FUNERAL** | ) | |
| **SERVICES OF ALABAMA,** | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED
SEP 30 2004

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 41.)[1] Plaintiff Mary Turley has sued her employer, defendant SCI of Alabama, alleging that defendant discriminated against her on the basis of her age and her sex. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 41), is due to be granted.

### I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.



as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every **reasonable** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. STATEMENT OF FACTS[2]

In 1999, plaintiff began working for defendant as a Sales Counselor. (Doc. 51, Ex. 1 at 59-61.) Plaintiff was a "very good salesperson" and consistently met her sales quota.

---

[2]Plaintiff's sole claim is based on her demotion to Sales Counselor. Therefore, the statement of facts is limited to only those facts relevant to the court's disposition of that claim.

(*Id.*, Ex. 2 at 37.) Defendant promoted plaintiff to Sales Manager in June 2000. (*Id.*, Ex. 1 at 80.) As a Sales Manager, plaintiff continued to sell. (*Id.* at 85-86.) At the time plaintiff was promoted, defendant allowed its Sales Managers to sell in order to ensure that the sales quotas for each facility were met. (*Id.*, Ex. 2 at 30-31.) Plaintiff earned commission from her personal sales as well as an "override" from the sales made by the Sales Counselors she supervised. (*Id.*, Ex. 1 at 85.)

In July or August 2001, Dan Murphy became Senior Regional Vice President of Pre-Need Sales. (*Id.*, Ex. 2 at 37-38, 56.) He believed that Sales Managers should limit their personal sales and should concentrate on recruiting, hiring, training, and assisting Sales Counselors. (*Id.* at 56.) Clifton Dempsey, Regional Vice President of Pre-Need Funeral Sales for defendant's Southern Region and plaintiff's immediate supervisor, testified:

> [Murphy said] [s]ales managers were required to work in the field with their counselors on a daily basis, training, going on appointments, setting appointments, working on the phone, helping them learn product knowledge, recruiting new sales counselors. And that by doing all of that, it limited [the sales managers] in terms of personal production.
>
> . . .
>
> He wanted the sales managers to be in the field ninety to ninety-five percent, producing with other counselors. If they had an opportunity that someone called and asked for them, they could certainly write that sale. But their position was not to go out and personally sell and produce the majority of volume as what [plaintiff] was doing.

(*Id.* at 66-67.) Murphy expected Sales Managers to meet their sales quota through the work of their Sales Counselors, and not through their own, personal sales. (*Id.* at 68.)

Shortly after he joined defendant, Murphy held a meeting with the Sales Managers under Dempsey's supervision – plaintiff, Emily Brady, Paul Moye and Cathy Simpson. (*Id.*, Ex. 1 at 117.) Emily Brady and Cathy Simpson are females over the age of forty; Paul Moye is a male in his thirties. (*Id.* at 127-28.) During the meeting, Murphy explained that he wanted all Sales Managers to recruit, train, and assist the Sales Counselors rather than personally sell. (*Id.* at 117-18; *id.*, Ex. 2 at 66.) Plaintiff testified:

> Dan Murphy had the meeting. . . . And he said the larger funeral homes, that we would have to quit selling and just start recruiting and training, because we have always been told sales managers we were not just sales manager[s], we were made to sell. That was our job, to sell. It was not to recruit people, train people, whatever. It was to make quota any way we could.
>
> . . .
>
> And he said on the bigger funeral homes, that they had to quit selling and just start recruiting and training people. They wanted more people hired. No matter what, they just wanted people hired and trained.

(Doc. 51, Ex. 1 at 118-19.) Plaintiff testified that "everybody" objected to the change; she said:

> A. Everybody objected because all of our funeral homes were not big funeral homes. I mean, they were not enough to – you couldn't be just a sales manager there because you don't have enough sales turnover for it. If you don't make sales and be a sales manager, then you don't make enough money to even have the job. We were not just required to be . . . sales managers; we were required to sell.
>
> Q. But now Mr. Murphy was changing –
>
> A. He was changing everything that August.

4

(*Id.* at 121-22.) Plaintiff admits that Murphy had the authority to change the job duties and responsibilities of the Sales Managers. (*Id.* at 147-48.)

Shortly after the meeting, plaintiff told Dempsey that she did not agree with Murphy's policy because "she produced the majority by far of the volume" in personal sales. (*Id.*, Ex. 2 at 69.) Dempsey testified that plaintiff did not like recruiting or working in the field with Sales Counselors; he said "She liked to personally sell, go out and sell[,] and that's what she was good at doing. And it was evident to me that she might not . . . want to do these strict guidelines and changes that were done." (*Id.* at 76.) He testified that plaintiff "was unwilling to perform the job description as outlined as a sales manager." (*Id.* at 143.)

On October 1, 2001, Murphy and Dempsey met; as a follow up to this meeting Dempsey sent Murphy a letter outlining the issues they had discussed. (*Id.*, ex. 6.) One of the items concerned plaintiff's performance as Sales Manager. Dempsey wrote:

> I will work intensively with Mary Turley and reiterate the functions and expectations of the sales manager position. This includes the required management time being spent with counselors in the field on a scheduled basis, daily recruiting efforts, promoting and carrying out the proper policies and procedures of the company . . . and her overall ability to build a strong sales organization. If she is unwilling or unable to carry out these duties and tasks, I will again speak to her about becoming a sales counselor.

(*Id.*)

On October 3, 2001, Dempsey met with plaintiff. (*Id.*, ex.7.) Plaintiff testified as follows regarding what happened at that meeting:

> A. [Dempsey came] up to my office and he said, "We need to have a meeting." I said okay. . . . He said, "I need to talk to you." I said, "About

5

what?" He said that Dan Murphy said that I either had to be a sales manager or a salesperson, that I couldn't be both. And so I kind of told him off.

> Q. When you say you "kind of told him off," tell me what you said.
> . . .
>
> Q. And what did Cliff say?
>
> A. I got up, started to walk out. I was going to leave and he says, "Mary, please just don't quit." He says, "If it wasn't for you, I wouldn't have quota." I said, "Do y'all think y'all going to do me just any way you want to?" And he said, "It's not me. Dan Murphy told me I had to do this. Dan Murphy said that if I can't do my job, 'I'll find somebody that will.'"
> . . .
>
> Q. So what did you say?
>
> A. There's no telling really. He said that – he said, "Is there anything that will make you stay?" And I said, "No, not really." He said, "Mary, I have to do this." He said, "If I don't do this, it's my job.'"
>
> Q. When he said "do this," tell me – you had to make a choice about sales manager or salesperson; is that correct?
>
> A. Right.

(*Id.*, Ex. 1 at 114-16.)[3]

---

[3] Dempsey, in a follow-up letter to plaintiff recapping their meeting, stated:

> We . . . discussed the functions of a sales manager. After reviewing a memo dated August 10, 2001, regarding working in the field with the counselors, producing $15,000 per week, you advised me that you felt you would be unable to meet those criteria. You prefer to be in the field selling and feel that selling is your strong suit, rather than management. We agreed to reclassify you as a sales counselor, and that you will be the unit manager at Collier Butler, heading up the Family Service Department at that location only.

(Doc. 51, Ex. 2, ex. 7.)

6

Plaintiff also testified that Dempsey told her that Murphy wanted a "well-dressed young man" for the Sales Manager position. (*Id.* at 131.)

Plaintiff testified in her deposition that she "had a choice" of remaining as Sales Manager "as long as [she] gave up selling." (*Id.* at 152-53.) She stated:

> Q. . . . But the fact is you could have maintained your position as a sales manager?
>
> A. I sure could have. But only as a sales manager, as long as I didn't sell.
>
> Q. That was unacceptable to you?
>
> A. Very unacceptable.
>
> . . .
>
> Q. But you made that decision, correct?
>
> A. He said, "You either sell or be a sales manager." And then I made decision that I would sell.
>
> Q. Okay. That you wanted to sell?
>
> A. No. I didn't want to sell. I made the decision that I had to sell, you know, to keep a job. But I really couldn't afford that.
>
> Q. Well, you could've continued as the sales manager, just choosing not to sell?
>
> A. But that would've been about one-third of the money.
>
> Q. Well, you don't know that for a certainty, do you?
>
> A. Pretty sure. Yeah, I made more money selling than I did as a sales manager. A lot more. I was selling over a hundred thousand a month.
>
> . . .

7

>Q. How much were your people selling?

>. . .

>A. Probably fifty, sixty thousand.

(*Id.* at 153-56.)

Plaintiff filed a charge of discrimination, alleging sex and age discrimination, with the EEOC on January 11, 2002. (*Id.*, ex. 4.) She filed the instant action on December 23, 2002. (Doc. 1.)

## C. DISCUSSION

Plaintiff alleges that she was "demoted" from Sales Manager to Sales Counselor on the basis of her age and her sex. The facts are undisputed that defendant did not actually demote plaintiff; rather, it gave plaintiff the choice of remaining a Sales Manager and performing the job in accordance with Murphy's directions *or* moving to a Sales Counselor's position. Therefore, the issue is whether these facts are sufficient to establish that plaintiff suffered an adverse employment action by defendant.

The Eleventh Circuit has held that "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions. Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1244 (11th Cir. 2001)(quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997)). Likewise, "[T]he

8

[ADEA] is not intended to prevent employers from changing the job responsibilities of their 40 to 65 year old employees. Neither is the Act intended to give 40 to 65 year old employees the right to walk out and sue their employer because they dislike their changed job responsibilities." *Frazer v. KFC Nat. Management Co.*, 491 F. Supp. 1099, 1105 (M.D. Ga. 1980), *aff'd* 636 F.2d 313 (5th Cir. 1981). Thus, "applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks." *Davis*, 245 F.3d at 1244.

As set forth above, Murphy shifted the Sales Manager's responsibility from personally selling to recruiting new sales counselors and working with them in the field. Plaintiff was informed by Dempsey that she would have to comply with Murphy's directive to eliminate or reduce the time she spent personally selling and increase the time she spent recruiting and training Sales Counselors, *or* continue selling, but only as a Sales Counselor. Plaintiff chose to continue selling. She did not have the option of continuing to perform the job of Sales Manager in a manner contrary to that established by Murphy at the meeting in August 2001. Plaintiff's election to return to the Sales Counselor position, rather than perform the job of Sales Manager in accordance with Murphy's admitted restructuring of the position, was not an adverse employment decision made by defendant. This seems obvious to the court.

Defendant's only deliberate decision was to restructure the position of Sales Manager; this, according to plaintiff, occurred in August 2001. Plaintiff did not wish to continue in the Sales Manager job with the change in responsibilities, which involved spending the majority of time recruiting and working with Sales Counselors in the field. Instead, she decided to

continue to spend her time selling. In October 2001, defendant told her she would have to perform the job responsibilities of the Sales Manager position, and, if she would not or could not, she could move to a Sales Counselor position. Plaintiff, not defendant, chose to move to the Sales Counselor position. Thus, her "demotion" was not the deliberate decision of the defendant.

Because plaintiff's demotion was the result of her decision not to perform the job of Sales Manager according to defendant's instruction, it was not the result of a deliberate decision of defendant. Thus, plaintiff so-called demotion is not an actionable adverse job action and her claims, which are based on the demotion will be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An order granting defendant's Motion for Summary Judgment, (doc. 41), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 30th day of September, 2004.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
United States District Judge